IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EIDO HUSSAM AL-NAHHAS, <br> also known as Mohammad Al-Nahhas, <br> on behalf of Plaintiff and the class members <br> described below, <br> <br> Plaintiff, <br> <br> vs. <br> <br> ROSEBUD LENDING LZO d/b/a ZocaLoans; <br> 777 PARTNERS LLC; <br> TACTICAL MARKETING PARTNERS, LLC; <br> and JOHN DOES 1-20, <br> <br> Defendants. | Case No. 22-cv-750 |

## COMPLAINT – CLASS ACTION

1. Plaintiff Eido Hussam Al-Nahhas brings this action to secure redress from predatory and unlawful loans (such as Exhibits A-D). The loans are made in the name of Defendant Rosebud Lending LZO d/b/a ZocaLoans. Other parties involved in making the loans are 777 Partners LLC; Tactical Marketing Partners, LLC, and John Does 1-20.

2. Plaintiff seeks a declaratory judgment that the loans are void and an injunction against their collection (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 et seq., and the Illinois Consumer Fraud Act, 815 ILCS 505/1 et seq. (Count III – the Predatory Loan Prevention Act provides that violations are a violation of the Illinois Consumer Fraud Act), and treble damages under RICO (Count IV).

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction under 28 U.S.C. §1331, 18 U.S.C. §1964, 28 U.S.C. §1337, and 28 U.S.C. §1367. Jurisdiction may also exist under 28 U.S.C. §1332(d).

4. This Court has personal jurisdiction over each Defendant because they knowingly participated in:

1

    a.    The making of unlawful loans to Illinois residents.

    b.    The operation of an interactive website through which loans were made.

*Toys "R" Us, Inc., v. Step Two,* 318 F.3d 446, 454 (3rd Cir. 2003).

5.    Venue is proper because acts to obtain and collect the loans impacted Plaintiff in the District.

## PARTIES

### Plaintiff

6.    Plaintiff Eido Hussam Al-Nahhas is a resident of the Northern District of Illinois. He is also known as Mohammad Al-Nahhas.

### Defendants

### Rosebud Lending LZO

7.    Defendant Rosebud Lending LZO d/b/a ZocaLoans is an online lender that offers loans to consumers at annual percentage rates of more than 500%. (Exhibit E) It purports to be an entity formed under the laws of, and claims to be owned and controlled by, the Rosebud Sioux Tribe, a federally-recognized Indian Tribe. (Exhibit A, page 1) It uses the addresses P. O. Box 1147, Mission, SD 57555, and 27565 Research Park Drive, Mission, SD 57555.

8.    The Mission Address is the offices of REDCO, the Rosebud Economic Development Corporation. It is also the offices of Rosebud Office Solutions which is engaged in "providing streamlined supply and procurement for local businesses and governmental entities." (https://www.sicangucorp.com/ros)

9.    On information and belief, REDCO's general manager, Mindi Jo Vavra (https://www.sicangucorp.com/about-us-1), was also as an executive for Fintech Financial, LLC, a non-tribal, Delaware-based "warehouse lender" which provides working capital to make loans to consumers for several online payday lenders.

10.    The Mission Address is also home to:

    a.    The Lakota Water Company;

   b. The Sicangu Community Development Corporation, an IRS-recognized 501c(3) non-profit corporation; and

   c. Tatanka Funds, a non-profit which provides down-payment assistance and home buying assistance in south central South Dakota.

11. On information and belief, neither ZocaLoans nor any consumer lending business operates at the Mission Address.

12. In fact, ZocaLoans is operated by (a) 777 Partners LLC and (b) Tactical Marketing Partners, LLC, both non-tribal entities organized under Delaware law and located in Miami, Florida.

13. Tactical Marketing Partners, LLC pays the Rosebud Sioux Tribe a small percentage of the revenues of each of ZocaLoans' loans in a "rent-a-tribe" agreement.

14. ZocaLoans is not tribally owned. The Rosebud Sioux Tribe simply claims ownership of the website as part of a "rent-a-tribe" scheme. The Tribe's involvement in the lending business is merely superficial. The Tribe's only real contribution is providing a cloak of sovereign immunity for lending activities.

15. The Rosebud Sioux Tribe has had a number of online payday websites, all of which charge consumer triple-digit interest rates, including:

   a. AdvanceMeToday.com, owned by "Rosebud Lending AMT";

   b. FirstPayLoans.com, owned by "Rosebud Lending BHL";

   c. MyQuickWallet.com, owned by "Rosebud Lending DRT";

   d. PixyCash.com, owned by "Rosebud Lending PCL";

   e. QCredit.com, owned by "Rosebud Lending RQC".

16. On information and belief, each of these websites represents a "rent-a-tribe" scheme with a different, non-tribal investor or investors.

17. Domain Name Registration records from 2019 show that zocaloans.com is registered to, and owned by, 777 Partners. (Exhibit F)

### 777 Partners LLC

18. Defendant 777 Partners LLC is a limited liability company organized under Delaware law with its principal address located at 600 Brickell Avenue, Suite 1900, Miami, FL 33131. Its registered agent is Frederick A. Love at that address. Its managers are Ed Gehres, Steven Pasko, Joshua Wander, John Sicilian, Tom Staz, and Damien Alfalla.

### Tactical Marketing Partners, LLC

19. Defendant Tactical Marketing Partners, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. It does business at 600 Brickell Avenue, Suite 1900, Miami, FL 33131.

20. 777 Partners LLC operates as a subsidiary of Tactical Marketing Partners, LLC.

21. ZocaLoans receives funding from Fintech as well as 777 Partners. Through its subsidiary, Tactical Marketing Partners, LLC, 777 Partners also provides the technological and data science infrastructure to underwrite loans.

22. On information and belief, Tactical Marketing Partners, LLC obtains consumer reports (credit reports) as agent or authorized service provider for ZocaLoans.

23. On information and belief, loan information is electronically transmitted to an employee of Rosebud Lending LZO located on the Rosebud Tribe's reservation in South Dakota. After a cursory, pro forma review, the loan is granted "final" approval and thus, supposedly, originated by Rosebud Lending LZO and protected under the auspices of tribal sovereign immunity.

24. On information and belief, the loans are funded by capital kept in bank accounts controlled by Tactical Marketing Partners, LLC and 777 Partners, to which the Rosebud Tribe, REDCO, and Rosebud Lending LZO have no access.

25. All material policies and procedures relating to the lending operation are instituted by Tactical Marketing Partners, LLC and 777 Partners, without input from the Rosebud Tribe, REDCO, or Rosebud Lending LZO.

**FACTS RELATING TO PLAINTIFF AL-NAHHAS**

26. In January 2020, Plaintiff Al-Nahhas took out an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit A). The loan had an amount financed of $350 and an annual percentage rate of 534.75%. This loan was paid off, including interest.

27. Exhibit A is a standard form loan agreement used by Rosebud Lending LZO d/b/a ZocaLoans on a regular basis.

28. Defendants regularly make loans to individuals in Illinois at such rates.

29. The loan was obtained for personal, family or household purposes and not for business purposes.

30. At no time have Defendants had a license from the Illinois Department of Financial and Professional Regulation or a state or federal banking or credit union charter, entitling them to make loans to Illinois residents at more than 9% interest.

31. Defendants nevertheless advertise and make loans to Illinois residents at rates greatly exceeding 9%.

32. Defendants sought out Illinois residents for such loans.

33. In March 2021, Plaintiff Al-Nahhas took out an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit B). The loan had an amount financed of $550 and an annual percentage rate of 693.10%. This loan was paid off, including interest.

34. In May 2021, Plaintiff Al-Nahhas took out an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit C). The loan had an amount financed of $750 and an annual percentage rate of 691.35%. This loan was paid off, including interest.

35. In September 2021, Plaintiff Al-Nahhas took out an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit D). The loan had an amount financed of $900 and an annual percentage rate of 585.21%. This loan is outstanding and has not been paid.

36. Defendant Rosebud Lending LZO d/b/a ZocaLoans has been contacting Plaintiff for the purpose of collecting the loan. (E.g., Exhibit G)

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

37. Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 et seq. "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

38. Under 815 ILCS 123/15-10-5(b), "Any violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

39. Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

40. Any loans to Illinois residents at more than 9% that are made by unlicensed persons are void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

41. Any loans to Illinois residents at more than 9% that are made by unlicensed lenders violate the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

42. Illinois has a criminal usury statute defines the making of a loan by unlicensed persons at more than 20% interest as a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 et seq). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

43. Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC,* 11cv8149, 2017 WL 758518, at *11 (S.D.N.Y. Feb. 27, 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.,* 16cv2781, 2017 WL 1536427, *7 (D.N.J., April 28, 2017).

44. The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g., In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569 (https://www.idfpr.com/dfi/ccd/Discipline/RedLeafVenturesCDOrder12CC569.pdf), *In the Matter of Money Mutual, LLC*, No. 12 CC 408 (https://www.idfpr.com/dfi/ccd/Discipline/MoneyMutualCDOrder12CC408.pdf); *In the Matter of Hammock Credit Services*, No. 12 CC 581 (https://www.idfpr.com/dfi/ccd/Discipline/HammockCreditCDOrder12CC581.pdf); *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133 (https://www.idfpr.com/dfi/CCD/Discipline/17CC133%20-%20Make%20Cents%20dba%20Maxlend%20Cease%20and%20Desist%20Order%20Bob%208%2016%202017.pdf)

## **RENT-A-TRIBE SCHEMES**

45. In an attempt to evade prosecution under usury laws of states like Illinois, non-tribal owners of online payday lending businesses frequently engage in a business model commonly

referred to as a "rent-a-tribe" scheme.

46. In such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

47. The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe.

48. In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

49. However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

50. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

51. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

52. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

53. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

54. Tribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

55. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

## COUNT I - DECLARATORY AND INJUNCTIVE RELIEF AGAINST ILLEGAL CONDUCT

56. Plaintiff incorporates paragraphs 1-55.

57. This claim is against all Defendants.

58. There is a controversy between Plaintiff and the class, on the one hand, and Defendants, on the other, as to whether Plaintiff must repay the outstanding loans made to them (Exhibit D, in Plaintiff's case).

59. Declaratory relief will resolve such controversy.

60. An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

## CLASS ALLEGATIONS

61. Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(2).

62. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 9% interest (c) which loan has not been paid in full.

63. Plaintiff may alter the class definition to conform to developments in the case and discovery.

64. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

65. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

66. Plaintiff will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

67. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

68. Defendant has acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

69. The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i.    Injunctive relief;

    ii.    Declaratory relief;

    iii.    Restitution of all amounts collected on the loans from members of the class;

    iv.    Costs of suit; and

    v.    Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

70. Plaintiff incorporates paragraphs 1-55.

71. This claim is against all Defendants.

72. Defendants contracted for and collected loans at more than 9% interest from Plaintiff and the class members, in violation of 815 ILCS 205/4.

73. Plaintiff and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

74. Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

75. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 9% interest (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

76. Plaintiff may alter the class definition to conform to developments in the case and discovery.

77. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there

are at least 40 class members.

78. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

79. Plaintiff will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

80. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

81. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i. Damages as provided in 815 ILCS 205/6.

    ii. Attorney's fees, litigation expenses and costs of suit; and

    iii. Such other and further relief as the Court deems proper.

### COUNT III – PREDATORY LOAN PREVENTION ACT AND ILLINOIS CONSUMER FRAUD ACT

82. Plaintiff incorporates paragraphs 1-55.

83. This claim is against all Defendants.

84. Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

85. Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 et seq.

### CLASS ALLEGATIONS

86. Plaintiff Al-Nahhas bring this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

87. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 36% interest (all of its loans qualify) (c) on or after March 23, 2021.

88. Plaintiff may alter the class definition to conform to developments in the case and discovery.

89. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

90. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

91. Plaintiff will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

92. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

93. A class action is superior for the fair and efficient adjudication of this matter, in that:

   a. Individual actions are not economically feasible.

   b. Members of the class are likely to be unaware of their rights;

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

   i. Compensatory damages;

   ii. Punitive damages;

   iii. Attorney's fees, litigation expenses and costs of suit; and

iv. Such other and further relief as the Court deems proper.

## COUNT IV – RICO

94. Plaintiff incorporates paragraphs 1-55.

95. This claim is against 777 Partners LLC and Tactical Marketing Partners, LLC, who are the RICO "persons."

96. All loans made in the name of Rosebud Lending LZO d/b/a ZocaLoans to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the usurious rate is at least twice the enforceable rate (9%).

97. The loans are therefore "unlawful debts" as defined in 18 U.S.C. §1961(6).

98. Rosebud Lending LZO d/b/a ZocaLoans is an enterprise affecting interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet.

99. Defendants 777 Partners LLC and Tactical Marketing Partners, LLC are associated with this enterprise, in that they direct the making of loans by Rosebud Lending LZO.

100. Defendants 777 Partners LLC and Tactical Marketing Partners, LLC conducted or participated in the conduct of the affairs of Rosebud Lending LZO through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

101. Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

102. Plaintiff brings this claim on behalf of a class.

103. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 9% interest (c) which loan was made on or after a date 4 years prior to the filing of suit.

104. Plaintiff may alter the class definition to conform to developments in the case and

14

discovery.

105. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

106. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

    a. Whether the loans at issue are "unlawful debts" as defined in RICO.

    b. Whether Rosebud Lending LZO d/b/a ZocaLoans is an "enterprise."

    c. Whether Defendants 777 Partners LLC and Tactical Marketing Partners, LLC, is associated with Rosebud Lending LZO d/b/a ZocaLoans.

    d. Whether Defendants 777 Partners LLC and Tactical Marketing Partners, LLC, conducted or participated in the affairs of Rosebud Lending LZO d/b/a ZocaLoans through a pattern of making and collecting unlawful loans.

107. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

108. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

109. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i. Treble damages;

    ii. Attorney's fees, litigation expenses and costs of suit; and

    iii. Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman (ARDC 0712094)
Tara L. Goodwin (ARDC 6297473)
Matthew J. Goldstein (ARDC 6339033)
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## **JURY DEMAND**

Plaintiff demands trial by jury.

> */s/ Daniel A. Edelman*
> Daniel A. Edelman

## **NOTICE OF LIEN AND ASSIGNMENT**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

*/s/ Daniel A. Edelman*
Daniel A. Edelman