**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| EIDO HUSSAM AL-NAHHAS,<br>also known as Mohammad Al-Nahhas, | ) ) ) ) | No. 22-cv-750 |
|  | ) | Judge John J. Tharp, Jr. |
| Plaintiff, | ) ) |  |
| v. | ) ) |  |
| ROSEBUD LENDING LZO<br>d/b/a ZocaLoans; 777<br>PARTNERS LLC; TACTICAL<br>MARKETING PARTNERS,<br>LLC, and JOHN DOES 1-20, | ) ) ) ) ) ) |  |
| Defendants. | ) |  |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Eido Hussam Al-Nahhas and Defendant Rosebud Lending LZO (doing business as "ZocaLoans") entered into a series of loan agreements that Al-Nahhas alleges were illegal and usurious under Illinois law. Al-Nahhas brought this proposed class action lawsuit against ZocaLoans, a company that purports to be tribally owned, and two other entities: 777 Partners LLC and Tactical Marketing Partners, LLC (the "777 Defendants"). Al-Nahhas contends that the 777 Defendants ran the show behind the scenes, using ZocaLoans' tribal immunity as a bulwark against liability for their predatory lending practices. Al-Nahhas has settled this suit with ZocaLoans, but the claims against the 777 Defendants remain.

Over fourteen months after Al-Nahhas filed his complaint, the 777 Defendants moved to compel arbitration, invoking a provision found in the loan agreements between Al-Nahhas and ZocaLoans. That provision, however, cannot help the 777 Defendants escape litigating this suit

in federal court. The 777 Defendants waived any purported arbitration right they claimed to have by making themselves at home here. In any event, the 777 Defendants cannot claim an agreement between Al-Nahhas and ZocaLoans as a source of the arbitration right as non-signatories to that agreement. Accordingly, the 777 Defendants' motion to compel arbitration is denied.

## BACKGROUND

ZocaLoans is a subsidiary of a corporation wholly owned by the RoseBud Sioux Tribe. As a lending business, ZocaLoans offers customers, including Illinois residents like plaintiff Al-Nahhas, short-term payday loans. "Payday loans are ostensibly short-term cash advances for people who face unexpected obligations or emergencies. The loans are typically for small sums that are to be repaid quickly—in anywhere from several weeks to a year." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 117 (2d Cir. 2019). These loans are characterized by exorbitantly high interest rates and fees and are banned in many states. *Id.* ZocaLoans' products are no exception: the annual percentage interest rates of some of the loans Al-Nahhas incurred exceeded 690 percent.

According to Al-Nahhas, the 777 Defendants and their subsidiaries are the true architects behind the ZocaLoans lending operation. Al-Nahhas alleges that the 777 Defendants use ZocaLoans—and its tribal sovereign immunity—to shield themselves from liability for offering loans considered usurious and illegal under Illinois law. At this juncture of the case, however, the plausibility of those allegations is not at issue. Instead, the parties' dispute centers around a series of loan agreements between Al-Nahhas and ZocaLoans, and specifically the arbitration provisions those agreements contain.

Between January 2020 and September 2021, Al-Nahhas took out four installment loans in amounts less than $1,000 from ZocaLoans. Each of the agreements between ZocaLoans and Al-

Nahhas to pay back the borrowed money (the "Loan Agreements") contained an arbitration provision pursuant to which Al-Nahhas agreed to arbitrate "any Dispute." 9/24/2021 Loan Agreement at 5, Ex. D to Compl., ECF No. 1-2.[1]

In relevant part, the Loan Agreements defined "Dispute" as including, "without limitation:"

> (a) all claims, disputes, or controversies arising from or relating directly or indirectly to this Arbitration Provision, ("this Provision"), the validity and scope of this Provision and any claim or attempt to set aside this Provision;
> (b) all U.S. federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to this Agreement, the information you gave us before entering into this Agreement, including your customer information application, and/or any past loan agreements between you and us;
> (c) all counterclaims, crossclaims and third party claims; [and]
> . . .
> (g) all claims asserted by you individually against the Tribe, us and/or any of our employees, agents, directors, officers, governors, managers, members, parent company or affiliated entities (collectively, "related third parties"), including claims for money damages and/or equitable or injunctive relief [.]

*Id.*

The arbitration provisions further provided that either Judicial Arbitration and Mediation Services of the American Arbitration Association would handle demands for arbitration, but that the arbitrator would apply the laws of the Rosebud Sioux Tribe. Any arbitration award would be enforced in the courts of the Rosebud Sioux Tribe or the Tribe's governmental regulator.

On February 10, 2022, Al-Nahhas sued ZocaLoans and the 777 Defendants on behalf of himself and a class of other Illinois residents who obtained high-interest-rate loans from ZocaLoans. The defendants jointly answered the complaint on September 1, 2022 and demanded

---

[1] For ease of citation, the Court refers to the most recent Loan Agreement between ZocaLoans and Al-Nahhas. All four Loan Agreements contain nearly identically worded arbitration provisions.

a jury trial. Neither their answer nor the Initial Status Report the parties jointly filed on September 9, 2023, made mention of any possibility of arbitration.[2] The Court subsequently set an initial discovery schedule and referred the case to Magistrate Judge Fuentes for discovery supervision and any further scheduling. Two months later, defendants' counsel moved to withdraw representation, citing "irreconcilable differences." New counsel for the 777 Defendants appeared on November 30, 2022, and in January of the new year, Al-Nahhas and the 777 Defendants filed a joint status report seeking to modify the discovery schedule previously set by the Court. In that status report, the 777 Defendants represented that they were "working to prepare Rule 26 disclosures and respond to the discovery propounded by plaintiff." 1/19/2023 Status Report ¶ 5, ECF No. 38.

New counsel for ZocaLoans appeared on March 2, 2023. The next day, Al-Nahhas moved to compel discovery from the 777 Defendants. In that motion, Al-Nahhas represented that he served discovery on the 777 Defendants in October 2022. He also represented that he conferred with the 777 Defendants' new counsel regarding discovery by telephone in December 2022 and February 2023 and by email in January 2023 and February 2023. Magistrate Judge Fuentes ordered a hearing on the motion, but before the hearing took place, the parties represented in a March 6, 2023 status report that the 777 Defendants agreed to respond to discovery by March 27, 2023.

---

[2] The Court recognizes that seven months is a long time to answer the complaint. After Al-Nahhas served ZocaLoans and the 777 Defendants, counsel moved for an extension of time to respond to the complaint, which the Court granted. Five days after the defendants missed the extended deadline, Al-Nahhas moved for an entry of default. The Court granted the defendants' subsequent motion to set aside the default, and the defendants answered the complaint in September 2022. The 777 Defendants attribute this delay to prior counsel's "lack of representation." 777 Defs.' Reply at 4, ECF No. 97.

Three days later, on March 9, 2023, the parties jointly moved for the entry of a confidentiality order. In response to Al-Nahhas's request for consent to file that joint motion, ZocaLoans' counsel consented with a reservation of a right to move to compel arbitration. Although the 777 defendants assert that counsel for 777 Defendants presented the same reservation, Al-Nahhas claims that they never privately raised arbitration. Al Nahhas further posits that March 2023 was the first time that ZocaLoans mentioned arbitration. About a month later, on April 7, 2023, ZocaLoans moved to compel arbitration and to stay discovery. The 777 Defendants followed suit on April 11, 2023.

Al-Nahhas and ZocaLoans have subsequently represented to the Court that they have reached a settlement to resolve Al-Nahhas's claims. This opinion therefore resolves only the 777 Defendant's motion to compel arbitration.

## DISCUSSION

The Federal Arbitration Act "mandates enforcement of valid, written arbitration agreements." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002). "To compel arbitration, a party need only show: (1) an agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal by the opposing party to proceed to arbitration." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 466 F.3d 577, 580 (7th Cir. 2006). That said, courts "evaluate agreements to arbitrate under the same standards as any other contract." *Tinder*, 305 F.3d at 733. It follows, therefore, that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

Only the first requirement of a motion to compel, whether Al-Nahhas and the Defendants agreed to arbitrate, is before the Court. Al-Nahhas posits that no enforceable arbitration agreement exists because (1) the 777 Defendants acted inconsistently with any purported

arbitration right, (2) the 777 Defendants were not parties to the Loan Agreements, and (3) the arbitration agreements' exclusive application of Tribal law renders them unenforceable as prospective, unconscionable waivers of Al-Nahhas's rights. The Court addresses each issue in turn.

In resolving a motion to compel arbitration, the Court applies the same evidentiary standard as that governing summary-judgment motions. *Tinder*, 305 F.3d at 735. That means "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## I.      Waiver

Al-Nahhas first argues that the 777 Defendants have waived the right to compel arbitration by failing to assert it earlier in the proceedings. "Like other contractual rights . . . the right to arbitrate is waivable." *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 891 (7th Cir. 2020). In determining whether a party waived its arbitration right, courts consider whether, "based on all the circumstances, the party against whom the waiver is to be enforced has acted inconsistently with the right to arbitrate." *Id.* (quoting *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 637 (7th Cir. 2002)).

### A.      Proper Decisionmaker

Before passing on the substance of the waiver question, the Court must determine whether it is appropriate to address it at all. The 777 Defendants argue that it is not, positing that the arbitrator must decide waiver questions. This is especially so, argue the 777 Defendants, in light of the provisions in the Loan Agreements delegating threshold arbitrability questions to the arbitrator.

Although authority points in competing directions, *compare Lillegard v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, No. 16 C 8075, 2017 WL 1954545, at *2 (N.D. Ill. May

11, 2017) *with Lukis v. Whitepages Inc.*, 535 F. Supp. 3d 775, 784 (N.D. Ill. 2021), the Court agrees with Al-Nahhas that the issue of waiver through litigation conduct is one for courts to decide. As Judge Feinerman noted in *Lukis*, § 3 of the Federal Arbitration Act exempts suits from mandatory stays pending arbitration when they involve parties who are "in default." 9 U.S.C. § 3. Many courts have interpreted "default" as used in § 3 to be synonymous with waiver through participation in litigation. *Lukis*, 535 F. Supp. 3d at 785 (collecting cases). Moreover, the ability of courts to address waiver by litigation conduct is consistent with parties' obligation to move for arbitration and courts' inherent power to determine whether a party forfeited a right through delay. *Id.* And, as Judge Feinerman further observed, holding otherwise would lead to "absurd consequences," such as, for example, sending a case to an arbitrator to determine whether a party waived its arbitration rights in the middle of trial. *Id.* at 786.

Supreme Court cases, to be sure, have used the word "waiver" when referring to issues within the arbitrator's domain. *See, e.g.*, *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34, (2014) (observing that that "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration," including "waiver, delay, or a like defense to arbitrability" (quoting *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983))). *But see Lillegard*, 2017 WL 1954545, at * 2 (noting this language but acknowledging tension in the case law). But as various circuit courts have noted, Supreme Court caselaw most likely refers to contractual waiver—such as, for example, a failure to satisfy a prerequisite for arbitration enumerated in a contract—rather than the litigation-conduct waiver that arises when a party fails to assert an arbitration right during court proceedings. *Lukis*, 535 F. Supp. 3d at 786-87. Whether a party's

conduct amounts to the former type of waiver is a decision delegated to an arbitrator, while the latter remains the province of courts.

This conclusion flows logically from the respective roles of court and arbitrator. After all, whether a party waived its right to arbitrate based on litigation conduct has nothing to do with the language of a contractual arbitration provision. It would make little sense for an arbitrator, who is tasked with interpreting contractual language, to interpret the parties' in-court conduct. Judge Feinerman's example about the assertion of arbitration rights in the middle of trial illustrates the point: a court managing a docket leading up to trial is better suited to interpret the parties' intentions than an absent arbitrator. The Supreme Court, moreover, has recently accepted the premise that the courts decide questions of litigation-conduct based waiver without question. *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1711 (2022) (noting that, when defendants delay in staying litigation pending arbitration, "***the court*** faces a question: Has the defendant's request to switch to arbitration come too late?" (emphasis added)). As a matter of statutory interpretation and common sense, a court is better suited to decide whether parties' litigation conduct amounts to waiver.

### B.     Parties' Litigation Conduct

Satisfied that it has the authority to decide the waiver issue, the Court turns to the litigation conduct at issue here. Several factors guide courts in the waiver analysis, including "whether the allegedly defaulting party participated in litigation, substantially delayed its request for arbitration, or participated in discovery." *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prod., Inc.*, 660 F.3d 988, 994 (7th Cir. 2011). Weighing most heavily is whether the party moving for arbitration exercised diligence. *Id.* In other words, courts ask, "[d]id 'the party seeking arbitration . . . do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration?'" *Smith v. GC*

*Servs. Ltd. P'ship*, 907 F.3d 495, 499 (7th Cir. 2018) (quoting *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995)).

Al-Nahhas raises several facts that he claims exhibit a lack of diligence on the part of the 777 Defendants. First, the 777 Defendants answered the complaint, including five affirmative defenses in their answer. Arbitration was not among them. By failing to include the arbitration defense in their answer, the 777 Defendants risked waiving it under Federal Rule of Civil Procedure 8(c)(1).[3]

Nonetheless, "a delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed as a result." *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 309 (7th Cir. 2010) (quoting *Best v. City of Portland*, 554 F.3d 698, 700 (7th Cir. 2009)). The 777 Defendants' failure to raise the arbitration issue right away did not substantially prejudice Al-Nahhas. Although, as described below, the 777 Defendants drove Al-Nahhas to expend resources to file a motion to compel, discovery barely progressed prior to the filing of the motion

---

[3] Rule 8(c)(1) requires parties responding to a pleading to "affirmatively state any avoidance or affirmative defense," including (among numerous other doctrines) "arbitration and award." There is a split of authority in the Circuits as to whether this rule requires the pleading of a prospective right to arbitrate the claim or applies only when arbitration of the claim has already occurred. *Compare*, *e.g.*, *Johnson Assocs. Corp. v. HL Operating Corp.*, 2010 WL 4942788, *2-3 (M.D. Tenn. Nov. 30, 2010) (reviewing 6th Circuit authority holding that 8(c)(1) requires pleading of a prospective right to arbitrate) *with Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 771 (10th Cir. 2010) (Rule 8(c) requires only pleading of an arbitration that has already occurred). The Seventh Circuit has not addressed this question, but in light of the appendage of "and award," this reference to arbitration likely refers not to a right to prospectively arbitrate a claim but to an arbitration proceeding that has already occurred—in other words, it is a species of *res judicata*. Nevertheless, the list set forth in the rule is not exhaustive, and "by requiring the defendant to plead any of the listed affirmative defenses and any other matters of avoidance that it wishes to raise or risk waiving them," the rule "serves the purpose of giving the opposing party notice of the defenses that are being put in issue and preserves the defendant's opportunity to argue why the claim for relief should not be barred completely." C. Wright & A. Miller, 5 Fed. Prac. & Proc. Civ. § 1270 (4th ed.). So, while failing to affirmatively plead a right to arbitration in an answer is not fatal standing alone, it is nevertheless inconsistent with an intent to arbitrate.

to compel. The parties, moreover, have not filed any dispositive motions. Rule 8(c) serves to give the opposing party notice of the affirmative defense and the opportunity to rebut it; if those conditions are satisfied, a finding of waiver may not be appropriate. *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005) (district court has discretion to allow an answer to be amended to assert an affirmative defense not raised initially). Here, Al-Nahhas knew of the arbitration clause in the contract he signed. And he has seized the opportunity to rebut the defense by responding to the instant motion. Defendants therefore did not waive the arbitration right merely by failing to plead it in their answer pursuant to Rule 8(c).

The Federal Rules do not end the inquiry, however. Prejudice may be a prerequisite to finding that a party waived an affirmative defense pursuant to Rule 8(c), but a party may still waive an arbitration defense, notwithstanding any lack of harm to the non-moving party. Indeed, "where it is clear that a party has forgone its right to arbitrate, a court may find waiver even if that decision did not prejudice the non-defaulting party." *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prod. Co.*, 969 F.2d 585, 590 (7th Cir. 1992); *accord Morgan*, 142 S. Ct. at 1711. If defendants acted inconsistently with the right to arbitrate, they waived arbitration, prejudice to plaintiff or not. The Seventh Circuit has explained why: "[p]arties know how important it is to settle on a forum at the earliest possible opportunity, and the failure of either of them to move promptly for arbitration is powerful evidence that they made their election— against arbitration." *Cabinetree*, 50 F.3d at 391.

The Court returns, therefore, to the 777 Defendants' litigation conduct. Fourteen months passed between the initiation of this suit and the 777 Defendants' motion to compel.[4] Eight of

---

[4] The 777 Defendants claim that they agreed to consent to the joint confidentiality order subject to a reservation of their arbitration rights but provide no record evidence to support that assertion. Al-Nahhas, however, asserts that the 777 Defendants never privately demanded

those months passed after the defendants filed their answer. That is a substantial period of time. *See Smith*, 907 F.3d at 500 (finding defendant acted inconsistently with arbitration right when it waited eight months to demand arbitration from the filing of suit). The 777 Defendants have attributed the delay to problems securing representation. Prior counsel, who jointly represented all the defendants, effectively abandoned representing the defendants at the start of litigation and formally moved to withdraw on November 16, 2022. The 777 Defendants' subsequent counsel appeared two weeks later, on November 30, 2022.

Although unfortunate, the 777 Defendants' difficulty with prior counsel is an "inadequate explanation" for the delay in seeking arbitration and militates against a finding that they acted diligently. *Id.* at 499-500. It is axiomatic that an attorney's acts as agent are attributable to the clients as principals. "That an attorney's conduct of the suit is inadequate may be grounds for a malpractice action against the attorney, but it is certainly no basis for requiring the defendant to pay the price of opposing counsel's dereliction." *Arteaga v. United States*, 711 F.3d 828, 834 (7th Cir. 2013). Prior counsel's failure to pursue arbitration cannot explain the delay. And a party delinquent in seeking to vindicate its rights cannot be said to have acted diligently. *See, e.g.*, *VIPshop Int'l Holdings, Ltd. v. Transpacific Trade Ctr. LLC*, No. 20 C 2557, 2022 WL 4119787, at *3 (N.D. Ill. Sept. 9, 2022).

To be sure, delay alone does not compel a waiver finding. *See Kawasaki*, 660 F.3d at 996 (two-year delay in moving to arbitrate not considered waiver where defendant "mentioned its desire to arbitrate at every turn"). "The question is not simply how much time has passed. The question is what the parties have done in the meantime." *Burke v. Amedisys, Inc.*, No. 17-CV-9232, 2023 WL 2803500, at *2 (N.D. Ill. Jan. 11, 2023) (thirteen-month delay in moving to

arbitration. The Court must construe the facts in the light most favorable to Al-Nahhas as the non-moving party. *Tinder*, 305 F.3d at 735.

compel did not necessitate waiver finding). The defendants' dilatory conduct is relevant in considering whether defendant acted diligently, *see VIPshop*, 2022 WL 4119787, at *3, but the central inquiry is whether the parties' participation in the litigation was consistent with its assertion of the arbitration right, *Kawasaki*, 660 F.3d at 994.

Assuming they enjoyed any arbitration right to assert (and as explained below, they did not), the 777 Defendants' conduct belied an intent to arbitrate. In addition to their fourteen-month delay, the 777 Defendants led Al-Nahhas on a fruitless discovery chase. On March 3, 2023, Al-Nahhas's counsel filed a motion to compel discovery from the 777 Defendants, representing that he conferred with counsel about responding to his discovery requests in December 2022, January 2023, and February 2023. Even acknowledging the 777 Defendants' difficulty with prior counsel until November 2022, it is unclear why, once they retained new counsel, the 777 Defendants failed, on four separate occasions when they communicated about the status of discovery, to inform Al-Nahhas of their intent to seek arbitration.[5] After Al-Nahhas moved to compel, moreover, the 777 Defendants agreed to respond to Al-Nahhas's discovery requests by the end of the month. It would be one thing if the 777 Defendants "merely respon[ded]" to discovery requests to "comply with obligations imposed by court rules." *Smith*, 2015 WL 5921098, at *4 (quoting *Honomichl v. Integrated Int'l Payroll Ltd.*, No. 09–CV–7218, 2010 WL 2025395, at *6 (N.D. Ill. May 21, 2010)). It is quite another to drag out discovery—by ignoring requests and repeatedly failing to mention arbitration during conferrals—and then

---

[5] Before Magistrate Judge Fuentes, the 777 Defendants' current counsel explained their delay in seeking arbitration by blaming prior counsel for failing to tender discovery and discovery requests to them. But Al-Nahhas attached the Loan Agreements to the complaint filed on the docket. The 777 Defendants thus cannot claim that they were unaware of the arbitration provisions at any point in this proceeding.

"drop[] a bombshell" by moving to compel arbitration only after finally agreeing to respond. *Cabinetree*, 50 F.3d at 389. That kind of about face does not manifest an intent to arbitrate.[6]

The 777 Defendants disagree and compare this case to *Lillegard v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, No. 16 C 8075, 2017 WL 1954545 (N.D. Ill. May 11, 2017). In that case, a court in this district found that defendants did not waive a right to arbitrate despite defendant's participation in discovery. *Id.* at *3. True, that case presents certain similarities; there, like here, the defendants did not remove the case to federal court, did not move to dismiss the case, and did not participate in non-written discovery. *Id.* In *Lillegard*, however, only six months passed between the filing of the complaint and the defendants' assertion of the arbitration right in court. *Id.* The 777 Defendants' fourteenth-month delay here is more than twice that long. And here, the 777 Defendants' silence on the arbitration point drove Al-Nahhas to move to compel discovery—despite multiple conferrals—and their subsequent representations led Al-Nahhas to believe that discovery responses were forthcoming. Nothing in *Lillegard* suggests the defendants there engaged in conduct similarly inconsistent with an intent to arbitrate.

This is not a case, moreover, in which defendants moved to compel arbitration as soon as they learned of the arbitration right. *Compare Kashkeesh v. Microsoft Corp.*, No. 21 CV 3229, 2023 WL 4181226, at *6 (N.D. Ill. June 26, 2023) (finding no waiver where defendant "didn't hesitate" once it learned about the arbitration clause). The 777 Defendants knew of the arbitration provision from the time Al-Nahhas filed the complaint, and at the very least by the time new counsel joined the case in November 2022. Yet, they sat on their hands and led Al-Nahhas to believe that they intended to proceed with discovery.

---

[6] In evaluating the 777 Defendants' litigation conduct, the Court does not consider any discovery that occurred after the 777 Defendants filed their motion to compel and accompanying motion to stay proceedings. The Court recognizes that Magistrate Judge Fuentes denied the stay motion and that the parties are obligated to participate in discovery pursuant to that decision.

Thus, even if the 777 Defendants could assert rights under Al-Nahhas's agreement with ZocaLoans (and as discussed below, they cannot), they waived any hypothetical right to arbitration through their conduct.

## II.     777 Defendants as Non-Signatories

Al-Nahhas argues that, even if the 777 Defendants had not waived a purported right to arbitration, their motion to compel arbitration fails for an independent reason. The 777 Defendants cannot assert an arbitration right as non-signatories to the contract between Al-Nahhas and ZocaLoans. The Court agrees.

Like the waiver issue, the Court must first determine whether it should leave this issue to an arbitrator. The "somewhat muddled state of federal law" notwithstanding, courts within this district have held that a non-signatory's standing to enforce an arbitration agreement is an issue for courts, rather than an arbitrator, to decide. *O'Connor v. Ford Motor Co.*, No. 19-CV-5045, 2023 WL 130522, at *5 (N.D. Ill. Jan. 9, 2023). "Whether [a non-signatory] has a right to compel arbitration is an issue of contract formation and must be decided by the court (regardless of the agreements' delegation clause)." *Kashkeesh*, 2023 WL 4181226, at *2 n.3. (collecting cases); *see also CCC Intelligent Sols. Inc. v. Tractable Inc.*, 36 F.4th 721, 723 (7th Cir. 2022) (agreeing that "a judge must decide whether the parties have agreed to arbitrate" in case interpreting the rights of a non-signatory to a contract); *Giron v. Subaru of Am., Inc.*, No. 22-CV-75, 2022 WL 17130869, at *4 (N.D. Ill. Nov. 21, 2022).

Having established the proper decisionmaker, the Court looks to Illinois law to decide whether the 777 Defendants may assert an arbitration right under the Loan Agreements. *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) ("A nonparty's right to enforce an arbitration

agreement is governed by state law.").[7] Under Illinois law, "[a] nonsignatory to a contract typically has no right to invoke an arbitration provision contained in that contract." *Id.* at 639 (citing *Caligiuri v. First Colony Life Ins. Co.*, 318 Ill. App. 3d 793, 252 Ill. Dec. 212, 742 N.E.2d 750, 755 (2000)). Illinois law recognizes, however, that third-party beneficiaries contemplated under the contract and agents of the contracting parties can invoke a contract's arbitration clause. *Id*. A nonsignatory seeking to enforce an arbitration agreement may also argue that a signatory is equitably estopped from resisting arbitration under certain circumstances. *Id.* The 777 Defendants invoke each of these three exceptions to glom onto the Loan Agreements. None of these exceptions, however, carry the day for the 777 Defendants.

## A.     Third-Party Beneficiary

The 777 Defendants first argue that the contract expressly contemplates them as third-party beneficiaries. To prevail on this argument, they must overcome a "strong presumption against conferring contractual benefits on noncontracting third parties." *Sosa*, 8 F.4th at 639 (quoting *Marque Medicos Farnsworth, LLC v. Liberty Mut. Ins. Co.*, 2018 IL App (1st) 163351, ¶ 12, 117 N.E.3d 1155). That is no easy feat; Illinois law requires that "the implication that the contract applies to third parties must be so strong as to be practically an express declaration." *Id.* (quoting *155 Harbor Drive Condo. Ass'n v. Harbor Point Inc.*, 209 Ill. App. 3d 631, 154 Ill.

---

[7] The parties seem to agree that Illinois law controls, and the Court sees no reason to disturb that decision. The plaintiff pursues legal theories grounded in the federal Racketeer Influenced and Corrupt Organization Act and state consumer protection laws against the 777 Defendants, and the Court is exercising supplemental jurisdiction over the state-law claims. "Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law." *McCoy v. Iberdrola Renewables, Inc*., 760 F.3d 674, 684 (7th Cir. 2014). Under Illinois choice-of-law rules, courts apply forum law "unless an actual conflict with another state's law is shown, or the parties agree that forum law does not apply." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) (quoting *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020)). The party seeking a choice-of-law determination bears the burden to raise a conflict. *Id.* Here, neither party contests that Illinois law applies so the Court will operate under that assumption.

Dec. 365, 568 N.E. 2d 365, 375 (1991)). An intention to directly benefit a third party must manifest in "identifying the third-party beneficiary by name or by description of a class to which the third party belongs." *Id.* (quoting *Martis v. Grinnell Mut. Reinsurance Co.*, 388 Ill. App. 3d 1017, 329 Ill. Dec. 82, 905 N.E.2d 920, 924 (2009)).

The Loan Agreements do not identify the 777 Defendants by name, and the 777 Defendants do not so claim. They argue instead that language in the contracts describes a class to which they belong. First, they point out that a "Dispute" mandating arbitration includes any claims "arising from or relating directly or indirectly to this agreement." 9/24/2021 Loan Agreement at 5, Ex. D to Compl., ECF No. 1-2. Al-Nahhas's dispute with the 777 Defendants undoubtedly arises from the Loan Agreements. But that limitation describes only the content of the dispute, not a *class* of persons to whom the dispute applies. *Compare Kashkeesh*, 2023 WL 4181226, at *1 (finding non-signatory was beneficiary where plaintiff agreed to arbitrate any dispute "between themselves and any other entity"). Without an "express provision" that identifies the parties subject to the dispute, a broad definition of "Dispute" alone does not manifest the requisite intent to confer a benefit upon a specific third party. *Sosa*, 8 F.4th at 639.

Second, the 777 Defendants reference the provision defining "Dispute" as "all counterclaims, crossclaims and third party claims." 9/24/2021 Loan Agreement at 5, Ex. D to Compl., ECF No. 1-2. Read in context, however, that provision cannot mean that it covers any claim that a plaintiff makes against any third party. *Gallagher v. Lenart*, 226 Ill. 2d 208, 233, 874 N.E.2d 43, 58 (2007) ("[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others."). "Counterclaims" and "crossclaims" are civil procedure terms that refer to claims a defendant makes against a plaintiff or against a co-defendant, respectively. A third-party claim in this

context, therefore, can only refer to a suit a ***defendant*** brings against an outside party. If, for example, ZocaLoans sued the 777 Defendants to recover for any of Al-Nahhas' claims against ZocaLoans, Al-Nahhas would have to arbitrate any dispute stemming from that crossclaim. *See, e.g.*, Fed. R. Civ. P. 14 (a)(3). But here, ZocaLoans has not sued the 777 Defendants; Al-Nahhas's lawsuit against the 777 Defendants stands independently. Because Al-Nahhas's suit is not a "third-party claim" within the meaning of the agreement, that provision does not describe a class to which the 777 Defendants belong either.

### B.    Agency

The 777 Defendants next attempt to assert rights under the agreement pursuant to an agency theory. Both the language of the Loan Agreements—which include in their definition of "Dispute" "all claims asserted by [Al-Nahhas] individually against the Tribe, us and/or any of our employees, agents, directors, officers, governors, managers, members, parent company or affiliated entities"—and Illinois law—*see Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508, 512, 812 N.E. 2d 534, 539 (2004)—allow agents to invoke arbitration rights on behalf of the principal. "The test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Chemtool, Inc. v. Lubrication Techs.*, *Inc.*, 148 F.3d 742, 745 (7th Cir. 1998) (quoting *Anderson v. Boy Scouts of Am., Inc.*, 226 Ill.App.3d 440, 168 Ill. Dec. 492, 589 N.E.2d 892, 894 (1992)) (collecting Illinois cases). Notably, the 777 Defendants maintain their independence from ZocaLoans and renounce any agency relationship. *See*, *e.g.*, Reply at 10 & n.6. Instead, the 777 Defendants claim that Al-Nahhas should be held to the allegations of agency in his complaint. Several problems plague that argument.

As a matter of pleading, Al-Nahhas's complaint does not suggest that the 777 Defendants were agents of ZocaLoans. In fact, Al-Nahhas suggests the opposite: that the 777 Defendants

exercised complete control over ZocaLoans—in other words, that ZocaLoans was an agent of the 777 Defendants. The language of the arbitration agreement, however, defines "Dispute" as one between Al-Nahhas and ZocaLoans' "agents," not one of its principals. 9/24/2021 Loan Agreement at 5, Ex. D to Compl., ECF No. 1-2.

If the 777 Defendants mean to suggest that they are entitled to arbitrate because ZocaLoans was acting as their agent when it entered into the Loan Agreements, the argument fails both procedurally and substantively. The 777 Defendants hinted at this argument, but only in their reply brief, thereby forfeiting it. *See Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019). And forfeiture aside, they have not offered anything to show that ZocaLoans had any "power to conduct legal transactions" in their names. *Ervin*, 349 Ill. App. 3d at 512, 812 N.E.2d at 539. In fact, they have disclaimed this very relationship.

The 777 Defendants also cite to an allegation in Al-Nahhas's complaint, which states that one of the 777 Defendants, Tactical Marketing Partners, LLC, "obtains consumer reports (credit reports) as an agent or authorized service provider for ZocaLoans." Compl. ¶ 22, ECF No. 1. But that allegation does not begin to support an inference that the scope of Tactical Marketing's agency extended to consummating or enforcing loan transactions on behalf of ZocaLoans. From that allegation alone, it does not follow that Tactical Marketing (much less both defendants) have legal authority "to affect legal relationships," *Sosa*, 8 F.4th at 641, on behalf of ZocaLoans. *See Chemtool*, 148 F.3d at 745 ("[N]ot all conduct creates agency relationships.").

No matter what Al-Nahhas alleges, moreover, the 777 Defendants cannot enforce an arbitration agreement as agents of ZocaLoans while disclaiming the authority to do so. Courts have required "evidence" of control and authority to support a claim of agency sufficient to invoke an arbitration right. *Sosa*, 8 F.4th at 641 (requiring "evidence" of control and authority to

support claim of agency); *see also Noe v. Smart Mortg. Ctrs., Inc*., No. 21 CV 1668, 2021 WL 4283027, at *6 (N.D. Ill. Sept. 21, 2021) (rejecting agency argument when defendants had "not offered evidence that [signatory] had control authority over the [non-party defendants'] work"). The 777 Defendants offer none. Instead, they concede that they are not agents of ZocaLoans at all. In so admitting, they must accept the accompanying concession that they have no legal authority to enforce the arbitration provisions based on agency. *See Ervin*, 349 Ill. App. 3d at 513, 812 N.E. 2d at 540 (rejecting defendant's claim of agency, particularly when the nonsignatory "steadfastly denie[d]" any relationship to the signatory). An agency theory does not bring 777 Defendants into a class contemplated by the Loan Agreements.

### C.     Equitable Estoppel

Finally, the 777 Defendants claim that they can assert arbitration rights pursuant to an equitable-estoppel theory. Under Illinois law, "[a] claim of equitable estoppel exists where a person, by his or her statements or conduct, induces a second person to rely, to his or her detriment, on the statements or conduct of the first person." *Sosa*, 8 F.4th at 641 (quoting *Ervin*, 349 Ill. App. 3d at 514, 812 N.E. 2d at 541). The party invoking equitable estoppel must have had no actual or constructive knowledge of the facts and must have reasonably relied on the other party's statements or conduct. *Id.*

The 777 Defendants do not identify any of Al-Nahhas's statements or conduct that induced their detrimental reliance. Al-Nahhas contracted only with ZocaLoans; the 777 Defendants were not subject to the terms of the agreement.

Instead of relying on the standard governing equitable estoppel claims under Illinois law, the 777 Defendants cite to *Paragon Micro, Inc. v. Bundy*, 22 F. Supp. 3d 880, 890 (N.D. Ill. 2014). In that case, the court articulated a federal common law standard for equitable estoppel, noting that it applies "when the signatory references to or presumes the existence of a written

19

agreement in asserting its claims against the non-signatory, and when the signatory raises allegations of 'substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract.'" *Id.* at 889-90 (N.D. Ill. 2014) (quoting *Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1004-05 (N.D. Ill. 2001)). Defendants' citation is a puzzling choice, given that the Seventh Circuit disavowed *Paragon Micro*'s application in *Sosa*, a case that the 777 Defendants subsequently cite. *Sosa*, 8 F.4th at 641-42.

In any case, courts have invoked this form of equitable estoppel when plaintiffs attempt to use a contract both as a sword and a shield. For example, a plaintiff cannot simultaneously assert that a defendant owes it a contractual duty but that the arbitration provision found in the contract does not apply to that defendant. *See Hughes Masonry Co. v. Greater Clark Cnty. Sch. Bldg. Corp.*, 659 F.2d 836, 838-39 (7th Cir. 1981). Al-Nahhas's claims in this case are different; Al-Nahhas does not seek to enforce any terms of his agreement with ZocaLoans against the 777 Defendants. Rather, Al-Nahhas's claims center on the 777 Defendants' conduct: their alleged predatory lending in violation of Illinois law. Thus, even if Illinois law permitted parties to invoke equitable estoppel without asserting detrimental reliance—and it does not—the 777 Defendants could not rely on such a theory.

In short, the 777 Defendants did not form an agreement with Al-Nahhas. Having failed to show that they were intended beneficiaries of the Loan Agreements, that ZocaLoans exercised control or authority over their activities, or that Al-Nahhas induced them to act to their detriment, the 777 Defendants cannot claim the benefit of arbitration pursuant to those agreements.

20

\* \* \*

The 777 Defendants cannot compel Al-Nahhas to arbitrate for two independent reasons.[8] By acting inconsistently with the right to arbitrate—namely, by waiting more than a year to raise the prospect of arbitration and leading plaintiff on a futile discovery pursuit in the meantime—the 777 Defendants waived any right to arbitrate Al-Nahhas' claims. But even had they raised a right to arbitrate "at the earliest possible opportunity," *Cabinetree*, 50 F.3d at 391, their motion would fail because the 777 Defendants were not signatories to the Loan Agreements and have not demonstrated that any nonparty enforcement doctrine should apply under Illinois law. Accordingly, they cannot invoke any benefit that agreement confers and their motion to compel arbitration is denied.

Dated: August 25, 2023

John J. Tharp, Jr.
United States District Judge

---

[8] Because it concludes that the 777 Defendants are not parties to the agreement, and in any case, waived any right to arbitrate, it need not consider Al-Nahhas's argument that the arbitration agreement is unenforceable pursuant to the doctrines of prospective waiver and unconscionability.