**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EIDO AL-NAHHAS, *individually, and on behalf of all similarly situated individuals*,<br><br>Plaintiff,<br><br>vs.<br><br>777 PARTNERS, LLC; F3EA CAPITAL, LLC; F3EA SERVICING, LLC; F3EA HOLDINGS, LLC; TACTICAL MARKETING PARTNERS, LLC; and JOHN DOES 1-20,<br><br>Defendants. | Case No.: 1:22-cv-00750<br><br>Judge John J. Tharp, Jr.<br>Magistrate Judge Gabriel A. Fuentes |

**<u>FIRST AMENDED COMPLAINT – CLASS ACTION</u>**

1.      Plaintiff Eido Al-Nahhas ("Plaintiff") brings this action to secure redress from predatory and unlawful loans (such as <u>Exhibits A-D</u>) made in the name of Rosebud Lending LZO d/b/a ZocaLoans by Defendants 777 Partners, LLC ("777 Partners"), Tactical Marketing Partners, LLC ("Tactical"), F3EA Capital, LLC ("F3EA Capital"), F3EA Servicing, LLC ("F3EA Servicing"), and F3EA Holdings, LLC ("F3EA Holdings").[1] The loans at issue charge triple-digit interest rates, often exceeding 800%, and are illegal in most states, including Illinois.

2.      Usury—the practice of lending money at unreasonably high rates of interest—"is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020). And "[a]s ancient as the practice of

---

[1]      777 Partners, Tactical, F3EA Capital, F3EA Servicing, and F3EA Holdings are sometimes collectively referred to as "Defendants" or the "777 Defendants."

usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Id.* This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more commonly, as "rent-a-tribe," a "recent incarnation of payday lending regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 753 (2012).

3. Under this model, non-tribal payday lenders and their business partners use Indian[2] tribes as a vehicle to originate illegal loans on the theory that the loans are subject exclusively to tribal law, and the lender entitled to sovereign immunity as a purported "arm-of-the-tribe," not the protections created by state usury, licensing, and consumer protection laws. But the loans nominally made by ZocaLoans are illegal irrespective of any purported tribal sovereign immunity, for sovereign immunity does not—and cannot—transform an otherwise illegal loan into a legal one. Rather, as the Fourth Circuit held in similar litigation: "substantive state law applies to off-reservation conduct," such as online loans marketed, collected, and paid by consumers in Illinois. *Hengle v. Treppa*, 19 F.4th 324, 348 (4th Cir. 2021); *see also Jackson v. Payday Fin., LLC*, 764 F.3d 765, 777-79 (7th Cir. 2014). And "although the Tribe itself cannot be sued for its commercial activities," its members, officers, and business partners "can be." *Hengle*, 19 F.4th at 348.

4. Defendants created, developed, aided, and abetted the usurious lending scheme complained of herein. As a result of this conduct, Plaintiff complains that Defendants violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, enacted for the express

---

[2] Throughout this complaint, Plaintiff uses the term "Indian" rather than "Native American," reflecting the fact that tradition, caselaw, and—perhaps most importantly—many indigenous persons themselves follow that practice.

purpose of "eradicat[ing] organized crime in the United States," including loan sharking. Pub. L. 91– 452, § 1.

5.	Plaintiff seeks a declaratory judgment that the loans are void and an injunction against their collection (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq*. and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq*. (Count III – the Predatory Loan Prevention Act provides that violations of the Act are a violation of the Illinois Consumer Fraud Act), and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (Count IV).

## JURISDICTION AND VENUE

6.	This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff has asserted claims arising under RICO, 18 U.S.C. § 1964. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.	The Court also has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiff and Defendants are citizens of different states; there are more than 100 members of the classes (as defined herein); and the aggregate amount in controversy exceeds $5 million, exclusive of attorney's fees, interest, and costs.

8.	In addition, the Court has diversity jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000 and Plaintiff is a citizen of Illinois and Defendants are, on information and belief, citizens of Floridia and Delaware.

9.	This Court has personal jurisdiction over each Defendant because they:

a.	Knowingly participated in the making and collection of unlawful loans to

Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at \*2-3, \*9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at \*33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b.  Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group*, *LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

c.  Purposefully directed the lending operation at Illinois consumers and with the intent of availing themselves of the privileges of doing business in Illinois. As detailed below, Defendants designed and implemented the lending model and actively participated in the affairs of the enterprise. 777

4

Partners uses Tactical, F3EA Capital, F3EA Servicing, and F3EA Holdings as conduits for its supervision, control, and profits of the ZocaLoans lending business. All of this was done with the intention of furthering a nationwide scheme which took advantage of consumers in Illinois and throughout the United States. Put differently, Defendants' management, oversight, and control over the usurious lending practices were undertaken with the intent to make and collect on loans to Illinois borrowers. Defendants purposefully availed themselves to the jurisdiction of this Court.

10. This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. *Stauffacher v. Bennett*, 969 F.2d 455, 460 (7th Cir. 1992) (finding nationwide service of process in Section 1965(b)), superseded by *Cent. States, Se. & Sw. Areas Pension Fund v. Reiner Express World Corp.*, 230 F.3d 934 (7th Cir. 2000). As a result, personal jurisdiction may be exercised over a defendant anywhere in the United States so long as it does not violate the Fifth Amendment to the Constitution of the United States. *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668 (7th Cir. 1987).

11. Because Defendants are all residents of the United States and have received millions of dollars from loans made in Illinois, the Court has personal jurisdiction over them under the Fifth Amendment.

12. Venue is proper because acts to obtain and collect the loans impacted Plaintiff in the Northern District of Illinois. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in Illinois, including in this District and Division. Venue is also proper in this District pursuant to 18 U.S.C.

5

§ 1965(a) because Defendants transacted their affairs in Illinois through their participation in a conspiracy and receipt and collection of millions of dollars from loans made in Illinois, to Illinois residents. In addition, venue is proper in this District and Division under the "ends of justice" because the Court has personal jurisdiction over Defendants and is already familiar with the legal issues and facts raised in this action.

13. Article III of the Constitution of the United States is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

### PARTIES

### Plaintiff

14. Plaintiff is a natural person, a resident of Oak Park, Illinois, and a citizen of Illinois.

### Defendants

### 777 Partners, LLC

15. Defendant 777 Partners, LLC is a Miami-based private investment and equity firm founded by Joshua Wander and Steven W. Pasko.

16. 777 Partners is a limited liability company organized under Delaware law with its principal address located at 600 Brickell Avenue, Suite 1900, Miami, FL 33131. Its managers are Steven W. Pasko, Joshua Wander, Ed Gehres, John Sicilian, Tom Staz, and Damien Alfalla. On

information and belief its members are citizens of Delaware and Floridia.

17. 777 Partners claims to own Defendant F3EA Servicing.

18. 777 Partners knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Rosebud Lending to consumers like Plaintiff. It is the ultimate beneficiary of the ZocaLoans lending operation.

### F3EA Capital, LLC

19. Defendant F3EA Capital, LLC is a limited liability company organized under Delaware law with its principal address located at 600 Brickell Avenue, Suite 1900, Miami, FL 33131. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. On information and belief its members are citizens of Delaware and Floridia.

20. F3EA Capital provides capital used to fund loans made by ZocaLoans and is the recipient of tens of millions of dollars of unlawful interest for which it contracted with Rosebud Lending to receive.

21. F3EA Capital is an affiliate of 777 Partners.

### F3EA Servicing, LLC

22. Defendant F3EA Servicing, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. It does business at 600 Brickell Avenue, Suite 1900, Miami, FL 33131 and 1855 Griffin Road, B390 Dania, FL 33004. On information and belief its members are citizens of Delaware and Floridia.

23. According to 777 Partners' website, F3EA Servicing "provides origination,

7

servicing, compliance and underwriting capabilities to various loan and leasing portfolios. F3EA supports client growth through its end to end servicing infrastructure..." (Exhibit G).

24. An attorney named Mollie Wander–Joshua Wander's sister–is a member of F3EA Servicing. Ms. Wander is intimately involved in the operation of ZocaLoans and negotiated the contracts awarded to the 777 Defendants along with Ed Gehres, the former General Counsel of 777 Partners.

25. Marie Gizzi, an employee of F3EA Servicing, states that she works for "Zocaloans subsidiary of F3EA Servicing LLC." Exhibit H And that in her capacity as a loan processor, she "[r]eview[s] and analy[zes] loan applications, credit bureau reports, bank statements and financial documentation to ensure all loan documentation is complete, accurate and verified before submitting to underwriting." *Id*.

26. Vanessa Ponce, an employee of F3EA Servicing, purports to be a "Customer Service Supervisor at Zoca Loans." Exhibit I.

27. F3EA Servicing is the recipient of tens of millions of dollars of unlawful interest for which it contracted with Rosebud Lending to receive.

28. F3EA Servicing has collected hundreds of millions of dollars of ZocaLoans payments made by consumers like Plaintiff.

### F3EA Holdings, LLC

29. Defendant F3EA Holdings, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. On information and belief its members are citizens of Delaware and Floridia.

30. On information and belief, Joshua Wander, co-founder of 777 Partners, sits on the board of F3EA Holdings.

31. F3EA Holdings has provided capital used to fund loans made by ZocaLoans and has collected loans made in the name of ZocaLoans.

32. F3EA Holdings knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Rosebud Lending to consumers like Plaintiff.

### Tactical Marketing Partners, LLC

33. Defendant Tactical Marketing Partners, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. It does business at 600 Brickell Avenue, Suite 1900, Miami, FL 33131. On information and belief its members are citizens of Delaware and Floridia.

34. Tactical knowingly contracted for or received, directly or indirectly, unlawful Interest from loans nominally made by Rosebud Lending to consumers like Mr. Al-Nahhas.

### FACTUAL BACKGROUND

**A.    State usury and licensing laws are designed to protect consumers from usurious loans**

35. "From times immemorial, governments have sought to protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013) (cleaned up). The United States is no exception. Indeed, "[a]s a nation, America has historically been deeply committed to usury law." Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13

(2008)).

36.     That commitment "grew directly out of shared public consciousness and acceptance" of moral traditions and laws like the English Statute of Anne, "which capped interest rates with a simple nominal annual rate of 5%." *Id*. (citing *Act to Reduce the Rate of Interest*, 1713, s Ann., c. 16 (Eng.)). "The first American usury law, adopted by the Massachusetts colony in 1641, pre-dates the U.S. Constitution by nearly 150 years." *Id*. at 1117. That law limited interest rates to no more than 8% per annum. *Id*.

37.     While the states were divided on many issues, usury was not among them. Each of the original states "adopted usury laws capping interest rates" between 5% and 8%. *Id*.

38.     Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these requirements, including Illinois, where Plaintiff applied for, received, and repaid his loans.

**B.     Illinois Prohibition on Predatory Loans**

39.     In Illinois, it is unlawful for anyone who does not have a bank or credit union charter, or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

40.     Any loan made by an unlicensed person to an Illinois resident at an interest rate exceeding 9% is void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain

any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

41. Any loan made by an unlicensed person to an Illinois resident at an interest rate exceeding 9% violates the Interest Act, 815 ILCS 205/4, and subject to statutory damages under 815 ILCS 205/6.

42. Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq*.). The statute applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State[.]" 720 ILCS 5/1-5.

43. Contracts made in violation of the licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice-of-law clauses nor other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.*, 16cv2781, 2017

U.S. Dist. LEXIS 64761, 2017 WL 1536427, *7 (D.N.J., April 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018).

44.     The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g.*, *In the Matter of Red Leaf Ventures, LLC*, No. 12 CC 569; *In the Matter of Money Mutual, LLC*, No. 12 CC 408; *In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

**C.     The Predatory Loan Prevention Act**

45.     Effective March 23, 2021, the Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq*. "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

46.     Under 815 ILCS 123/15-10-5(b), "[a]ny violation of the [PLPA], including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

47.     By, among other things, making or arranging the loans complained of herein, Defendants violated the Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq*.

48.     The PLPA provides that it "applies to any person or entity that offers or makes a loan to a consumer in Illinois" (815 ILCS 123/15-1-15(a)) as well as "to any person or entity that

seeks to evade its applicability by any device, subterfuge, or pretense whatsoever." 815 ILCS 123/15-1-15(b).

49.     The PLPA specifically covers loans made to Illinois residents over the internet. 815 ILCS 123/15-1-10 defines "loan" to include "closed-end and open-end credit, retail installment sales contracts, motor vehicle retail installment sales contracts, and any transaction conducted via any medium whatsoever, including, but not limited to, paper, facsimile, Internet, or telephone."

50.     815 ILCS 123/15-5-15, "no evasion," provides:

(a)     No person or entity may engage in any device, subterfuge, or pretense to evade the requirements of this Act, including, but not limited to, making loans disguised as a personal property sale and leaseback transaction; disguising loan proceeds as a cash rebate for the pretextual installment sale of goods or services; or making, offering, assisting, or arranging a debtor to obtain a loan with a greater rate or interest, consideration, or charge than is permitted by this Act through any method including mail, telephone, internet, or any electronic means regardless of whether the person or entity has a physical location in the State.

(b)     If a loan exceeds the rate permitted by Section 15-5-5, a person or entity is a lender subject to the requirements of this Act notwithstanding the fact that the person or entity purports to act as an agent, service provider, or in another capacity for another entity that is exempt from this Act, if, among other things:

(1)     the person or entity holds, acquires, or maintains, directly or indirectly, the predominant economic interest in the loan; or

(2)     the person or entity markets, brokers, arranges, or facilitates the loan and holds the right, requirement, or first right of refusal to purchase loans, receivables, or interests in the loans; or

(3)     the totality of the circumstances indicate that the person or entity is the lender and the transaction is structured to evade the requirements of this Act. Circumstances that weigh in favor of a person or entity being a lender include, without limitation, where the person or entity:

(i)     indemnifies, insures, or protects an exempt person or entity for any costs or risks related to the loan;

(ii)     predominantly designs, controls, or operates the loan program; or

13

        (iii)    purports to act as an agent, service provider, or in another capacity for an exempt entity while acting directly as a lender in other states.

51. Waiver of the PLPA is expressly forbidden. 815 ILCS 123/15-10-25 ("[t]here shall be no waiver of any provision of this Act."). The inclusion of "a nonwaiver provision is indicative of the Illinois legislature's intent to establish public policy." *Fahy v. Minto Dev. Corp.*, 722 F. Supp. 3d 784, 806 (N.D. Ill. 2024) (citations omitted).

52. Any purported waiver of the PLPA is unconscionable and violative of a fundamental public policy of Illinois. *Harris v. FSST Mgmt. Servs., LLC*, 686 F. Supp. 3d 734, 743 (N.D. Ill. 2023).

## Overview of Defendants' Enterprise

53. Rosebud Lending LZO d/b/a ZocaLoans purports to be an entity formed under the laws of, and claims to be owned and controlled by, the Rosebud Sioux Tribe, a federally-recognized Indian Tribe in South Dakota. (Exhibit E) Rosebud Lending uses the addresses P.O. Box 1147, Mission, South Dakota 57555 and 27565 Research Park Drive, Mission, South Dakota 57555. Rosebud Lending has no colorable claim to sovereign immunity as an "arm of a tribe."

54. The Mission Address purportedly houses the offices of REDCO, the Rosebud Economic Development Corporation. It is also the offices of Rosebud Office Solutions which purports to be engaged in "providing streamlined supply and procurement for local businesses and governmental entities."

55. On information and belief, REDCO's general manager, Mindi Jo Vavra was an executive for Fintech Financial, LLC, a non-tribal, Delaware-based "warehouse lender" which provides working capital to make loans to consumers for several online payday lenders.

56. The Mission Address is also home to:

    a. The Lakota Water Company;

    b. The Sicangu Community Development Corporation, an IRS-recognized 501(c)(3) non-profit corporation; and

    c. Tatanka Funds, a non-profit which provides down-payment assistance and home buying assistance in south central South Dakota.

57. Neither Rosebud Lending nor any other consumer lending business operates at the Mission Address.

58. The license that purports to authorize the making of loans by Rosebud Lending LZO d/b/a ZocaLoans was signed by Eric Lochen, an attorney based in Minnesota with ties to various tribal lending schemes. (Exhibit F) Mr. Lochen is not a member of the Rosebud Sioux Tribe, nor any other federally-recognized Indian tribe.

59. The Rosebud Sioux Tribe claims to own Rosebud Lending, but its involvement in the lending business is merely superficial. The Tribe's only real contribution is to provide a cloak of sovereign immunity for the lending activities complained of herein.

60. Subsidiaries of entities that claim to be owned by REDCO have purported to operate various websites, all of which charge consumers triple-digit interest rates, including:

    a. AdvanceMeToday.com, owned by "Rosebud Lending AMT";

    b. FirstPayLoans.com, owned by "Rosebud Lending BHL";

    c. MyQuickWallet.com, owned by "Rosebud Lending DRT";

    d. PixyCash.com, owned by "Rosebud Lending PCL"; and

    e. QCredit.com, owned by "Rosebud Lending RQC."

61. On information and belief, each of these websites represents a "rent-a-tribe" scheme with a different, non-tribal investor or investors.

62. The lending enterprise doing business as ZocaLoans operates for the principle benefit of: (a) 777 Partners, (b) F3EA Capital, (c) F3EA Servicing, (d) F3EA Holdings, and (e) Tactical–-all are non-tribal entities organized under Delaware law and located in or around Miami, Florida.

63. The 777 Defendants pay Rosebud Lending a small percentage of the revenues generated from ZocaLoans' loans in a "rent-a-tribe" agreement as outlined herein.[3] Rosebud Lending, in turn, pays REDCO a nominal share of the monies it receives for the use of REDCO and the Tribe's name.

64. Between 2018 and 2022, Defendants made 10,000 ZocaLoans to Illinois residents.

65. Defendants sought out Illinois residents for loans. ZocaLoans' website states that it makes loans to residents of Illinois but not residents of other states. On information and belief, the selection of states is tied to the likelihood of state officials taking enforcement action against Defendants.

66. On information and belief, 777 Partners approached individuals associated with the Rosebud Sioux Tribe in 2015 with a pitch to create an online lending business. In exchange for use of the Tribe's economic development corporation's name, 777 Partners offered to provide the

---

[3] *See*, *e.g.*, REDCO Annual Report for 2019 (showing Rosebud Lending with $51 million in assets, but REDCO only receiving $3 million in revenues, and "management fee" of over $30 million paid out to non-tribal entities); REDCO Annual Report for 2018 (stating Rosebud Lending had operating revenue of only $1.8 million, and showing a $936,933 "Management Fee" paid out to non-Tribal entities); *see also e.g.*, 2021.06.15 public Facebook Post by Lynne Colombe ("We haven't seen any revenue from REDCO since 2019 (less than $300k)" "I'm tired of learning more about our 'Tribal business' from Google").

capital used to fund loans made by ZocaLoans and provide the resources necessary to operate all aspects of an online lending operation.

67.     777 Partners has total control of Rosebud Lending and manages all substantive aspects of the lending business. For example, 777 Partners and its affiliates, among other things: (i) maintain a sweeping security interest in the lending operation (Exhibit J)[4]; (ii) control the lending operation's operating account by way of a deposit account control agreement (Exhibit K); and (iii) are responsible for, among other things, marketing, servicing, funding, and collection of loans made in the name of Rosebud Lending.

68.     777 Partners has seen that its affiliates and subsidiaries receive all lucrative marketing and servicing contracts (Exhibit L) and has entered into multiple revolving loan and security agreements (Exhibit M) whereby it has advanced close to $100 million to fund the underlying loans.

69.     The 777 Defendants also provide the technological and data science infrastructure to underwrite the loans.

70.     All material policies and procedures relating to the lending operation are instituted by the 777 Defendants without input from the Rosebud Tribe, REDCO, Rosebud Lending, or Rosebud Lending LZO.

---

[4] The financing statement covers the following collateral: all rights, interests, powers and privileges in and to the following assets now existing or hereafter arising: (i) all consumer loan receivables; (ii) all promissory notes evidencing such consumer loan receivables, together with all agreements executed in connection therewith; (iii) all rights and interests which Debtor may at the time have by law or agreement against any obligor obligated to make payment of such consumer loan or against property of such obligor; (iv) the accounts identified in the security agreement ("operating accounts", currently held at…, account number….) and (v) all proceeds of any and all of the foregoing.

71. Loans made in the name of Rosebud Lending are funded by 777 Partners, F3EA Capital, F3EA Servicing, and F3EA Holdings.

72. The monies used to fund loans made in the name of ZocaLoans are kept in bank accounts controlled by the 777 Defendants to which the Rosebud Tribe Sioux Tribe, REDCO, Rosebud Lending, and Rosebud Lending LZO have no access.

73. F3EA Servicing entered into two Master Servicing Agreement with Rosebud Lending and provides a comprehensive suite of services to the ZocaLoans enterprise, including, but not limited to:

    a.    Marketing;

    b.    Call center;

    c.    Compliance;

    d.    Administrative;

    e.    Lead generation;

    f.    Risk and underwriting;

    g.    Modeling;

    h.    Collection; and

    i.    Risk-based marketing.

74. UCC filings reveal that F3EA Capital has a security interest in Rosebud Lending's:

    a.    Assets including proceeds and products;

    b.    Negotiable instruments including proceeds and profits; and

    c.    Accounts including proceeds and profits. <u>Exhibit J</u>.

75.     F3EA Capital has entered into multiple revolving loan and security agreements with Rosebud Lending.

76.     Rosebud Lending claims that only the following three people are involved in the operation of ZocaLoans: "Clay Colombe, REDCO Chief Executive Officer, Mandy Medearis, Rosebud Lending LZO d/b/a ZocaLoans Operations and Compliance Manager, and Leah Running Bear, Rosebud Lending LZO d/b/a ZocaLoans loan specialist." Exhibit N.

77.     The claim is false. Rosebud Lending does not know who is involved in the ZocaLoans enterprise because all aspects of the operation are run by the 777 Defendants.

78.     Domain registration records from 2019 show that www.zocaloans.com is registered to 777 Partners (Exhibit O).

79.     The profile of Jennifer Menard, a Senior Operations Analyst at 777 Partners, states that, "[p]rior to joining 777" Menard "was employed by F3EA Holdings in April 2016, with the ZocaLoans portfolio as payment processor..." Exhibit P.

80.     On information and belief, 777 Partners has ties to other high interest payday lenders.[2]

81.     Defendants are not, and have never claimed to be, employees, directors, officers, governors, managers, members, parent companies, or affiliates of the Tribe or Rosebud Lending

---

[2]     *See, e.g.*, www.777part.com/team_member/ed-gehres/ (last visited July 1, 2022) ("Mr. Gehres also recently served as outside General Counsel to Think Finance) (Exhibit Q); www.777part.com/team_member/matthew-ghourdjian/ (last visited December 1, 2022) ("Mr. Ghourdjian served as [ ] the CIO of DiTech.com and CashCall.") (Exhibit R); www.777part.com/team_member/hussien-sleiman/ (last visited April 5, 2022) ("Mr. Sleiman was the lead technical architect and manager on the development of the CashCall and LoanMe cloud native lending and servicing platforms") (Exhibit S).

19

LZO, and no principle-agent relationship exists between Rosebud Lending LZO and Defendants or between the Tribe and Defendants.

## FACTS RELATING TO PLAINTIFF

82. In January 2020, Plaintiff obtained an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit A). The loan had an amount financed of $350 and an annual percentage rate of 534.75%. Plaintiff paid the loan in full, including interest payments.

83. In March 2021, Plaintiff obtained an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit B). The loan had an amount financed of $550 and an annual percentage rate of 693.10%. This loan was paid off, including interest.

84. In May 2021, Plaintiff obtained an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit C). The loan had an amount financed of $750 and an annual percentage rate of 691.35%. This loan was paid off, including interest.

85. In September 2021, Plaintiff obtained an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit D). The loan had an amount financed of $900 and an annual percentage rate of 585.21%. This loan is outstanding and has not been paid.

86. Exhibits A-D are standard form loan agreements used by Defendants on a regular basis.

87. Defendants regularly make loans to individuals in Illinois, and throughout the United States, at such rates.

88. The loans (Exhibits A-D) were obtained for personal, family or household purposes and not for business purposes.

89. At no time have any of the Defendants had a license from the Illinois Department of Financial and Professional Regulation or a state or federal banking or credit union charter, entitling them to make loans to Illinois residents at more than 9% interest.

90. Defendants nevertheless advertise and make loans to Illinois residents at rates greatly exceeding 9%.

91. Defendants sought out Illinois residents for such loans.

92. Defendants have been contacting Plaintiff for the purpose of collecting the loan. (E.g., Exhibit G)

93. The excessive interest charges imposed by Defendants were willful.

## SOVEREIGN IMMUNITY AS A DEFENSE TO STATE USURY LAWS

94. In an attempt to evade prosecution under usury laws of states like Illinois, non-tribal owners of online payday lending businesses–such as the 777 Defendants–engage in a business model commonly referred to as a "rent-a-tribe" scheme.

95. Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

96. The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe.

97. In exchange for use of the tribe's name, the beneficial owner of the payday

21

Lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

98.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

99.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

100.    These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by non-tribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

101.    Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

102.    Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g.*, *United States v. Neff*, 787 F. App'x 81 (3d Cir.

2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

103.    Indeed, "[t]ribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

104.    Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on fourteen felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

**COUNT I - DECLARATORY AND INJUNCTIVE**
**RELIEF AGAINST ILLEGAL CONDUCT**

105.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

106.    This claim is against all Defendants.

107.    There is a controversy between Plaintiff and the class, on the one hand, and Defendants, on the other, as to whether Plaintiff must repay the outstanding loan made to him (Exhibit D, in Plaintiff's case).

108.    Declaratory relief will resolve such controversy.

109.    An injunction is necessary to prevent Defendants from taking any further action to collect the void debts.

23

## CLASS ALLEGATIONS

110. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

111. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 9% interest (c) which loan has not been paid in full.

112. Plaintiff may alter the class definition to conform to developments in the case and discovery.

113. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 1,000 class members.

114. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

115. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

116. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

117. Defendant has acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

24

118. The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.      Injunctive relief;

      ii.      Declaratory relief;

      iii.      Restitution of all amounts collected on the loans from members of the class;

      iv.      Costs of suit; and

      v.      Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

119. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

120. This claim is against all Defendants.

121. Defendants contracted for and collected loans at more than 9% interest from Plaintiff and the class members, in violation of 815 ILCS 205/4.

122. Plaintiff and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

123. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

124. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 9% interest (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

125. Plaintiff may alter the class definition to conform to developments in the case and discovery.

126. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 1,000 class members.

127. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

128. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

129. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

130. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.      Damages as provided in 815 ILCS 205/6;

      ii.      Attorney's fees, litigation expenses and costs of suit; and

      iii.      Such other and further relief as the Court deems proper.

### COUNT III – PREDATORY LOAN PREVENTION ACT AND ILLINOIS CONSUMER FRAUD ACT

131.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

132.    This claim is against all Defendants.

133.    Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

134.    Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

### CLASS ALLEGATIONS

135.    Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

136.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 36% interest (all of its loans qualify) (c) on or after March 23, 2021.

137.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

138.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 5,000 class members.

139.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

140.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

141.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

142.     A class action is superior for the fair and efficient adjudication of this matter, in that:

   a.     Individual actions are not economically feasible.

   b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

   i.     Compensatory damages;

   ii.    Punitive damages;

   iii.   Attorney's fees, litigation expenses and costs of suit; and

   iv.    Such other and further relief as the Court deems proper.

28

## COUNT IV – RICO

143.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

144.     This claim is against Defendants 777 Partners, LLC, F3EA Holdings, LLC, F3EA Servicing, LLC, F3EA Capital, LLC, and Tactical who are the RICO "persons." 18 U.S.C. § 1964(3).

145.     Defendants 777 Partners, LLC, F3EA Holdings, LLC, F3EA Servicing, LLC, F3EA Capital, LLC, and Tactical violated § 1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

146.     RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

147.     The means and methods by which the 777 Defendants and other members and associates conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states, including Illinois, where the usurious rates charged were at least twice the enforceable rate. The 777 Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under Illinois, and various other state laws, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

148.     In addition to legal limits of interest that may be charged under Illinois law, most

29

other jurisdictions in the United States have limits on the amounts of interest that a lender may charge. *See, e.g.*, Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); Kan. Stat. § 16a-5-201; La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9¬A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53¬166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3¬201; Or. Rev. Stat.

30

§ 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

149. All of the loans made to members of the Class and Subclass and collected by the Defendants included an interest rate far in excess of twice the enforceable rate. Each of the Defendants was associated with the enterprise through the collection of unlawful debts.

150. As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

151. In the alternative, Rosebud Lending LZO d/b/a ZocaLoans is an "enterprise" engaged in, and whose activities affect, interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet. The enterprise's leadership is based in Miami, Florida, and other locations as addressed in preceding paragraphs. The enterprise operates throughout the United States, including the Northern District of Illinois, as well as in Germany and Panama.

31

152. Defendants 777 Partners, Tactical, F3EA Holdings, F3EA Servicing, and F3EA Capital are associated with this enterprise, in that they direct the making of loans by Rosebud Lending LZO and finance the operation.

153. The enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities

154. The 777 Defendants have all participated in the formation and operation of this scheme to defraud borrowers while attempting to take advantage of tribal immunity through the association with the Tribe.

155. The lending enterprise operates through ACH transactions, such as those involving the payments by Plaintiff. These ACH transactions involve interstate commerce because they flow through Rosebud Lending's bank account in Missouri, Plaintiff bank account in Illinois, and through various intermediaries across the United States. Additionally, the enterprise involves the receipt of usurious interest through interstate banking transactions to the 777 Defendants in Miami, Florida.

156. The lending enterprise operates through a website, created and overseen by the 777 Defendants, at www.zocaloans.com. The website furthers the illegal financial transactions. The website allows individuals to enter information to execute ACH wire transfers to the individual borrower and to debit the person's account in the purported repayment of the illegal debt. The website involves transactions in interstate commerce.

157. The 777 Defendants work together and function as a continuing unit for a common

purpose of achieving the enterprise's objectives, namely the enrichment of the 777 Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

158. Acting in concert, the 777 Defendants created the ZocaLoans enterprise with essential lending services provided by F3EA Servicing so that they could attempt to take advantage of the doctrine of tribal sovereign immunity for the express purpose of trying to avoid state and federal laws that regulate and ban payday lending at usurious rates of interest.

159. The 777 Defendants defined the types of loans that ZocaLoans would offer to customers and the illegal terms on which the loans would be created.

160. The 777 Defendants acted in concert in knowingly marketing the loans via the Internet and through pre-screened marketing solicitations to borrowers who reside across the United States–including Illinois–and not on Tribal lands.

161. The 777 Defendants exercised pervasive control over the lending operation as detailed in the previous sections.

162. As alleged above, the 777 Defendants, and other participants not yet known to Plaintiff, violated § 1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

163. In operating and conducting the affairs of the enterprise, the 777 Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise. The 777 Defendants have modified and reinvested their collections of net revenue from the enterprise to improve the optics and viability of the business model.

33

164. The predicate acts of collection of unlawful debt by the 777 Defendants are described herein. The debts incurred by Plaintiff and all other members of the Class and Subclass are unlawful and unenforceable.

165. The 777 Defendants established the illegal enterprise and have intentionally and willfully committed mail fraud and wire fraud through the use of ACH transactions to put money into Plaintiff's and Class and Subclass members' accounts, by withdrawing funds from those accounts while maintaining that the withdrawals were legitimate, by using the Internet to obtain consent to a fraudulent lending agreement and choice of law provisions, and by using the mail to collect payments and communicate with other parts of the ZocaLoans enterprise.18 U.S.C. §§ 1341, 1343. The use of the mail and wire transfers was reasonably foreseeable because the form documents specifically call for the use of ACH transactions or mail to make payments on the illegal loans.

166. 777 Partners, acting in concert with F3EA Servicing, Tactical, F3EA Capital, and F3EA Holdings, operated ZocaLoans in a scheme to defraud tens of thousands of people in a financially challenged position by extending loans at illegally high and extortionate interest rates. To advance this scheme, the 777 Defendants created the ZocaLoans enterprise, to initiate wire transfers and interstate mailings, and to operate via the Internet through which information was collected from the victims of the scheme and purported agreements were exchanged with targets of the scheme. Defendants knowingly intended to defraud Plaintiff and other the victims of the lending scheme.

167. The racketeering activity at issue is related and continuous. The hundreds of thousands of ACH transactions served and continue to serve the central scheme created and

developed by the 777 Defendants to make illegal loans at extortionate interest rates. The hundreds of thousands of ACH transactions served the common scheme of evading state laws, defrauding people in financially challenged positions, and generating massive profits – for non-Tribal members. The scheme to evade state laws was designed, implemented, and/or maintained by the 777 Defendants through ZocaLoans.

168. The 777 Defendants' leadership, management, and participation in the enterprise began at some point as early as 2015, and continues to date, and will occur repeatedly in the future to the detriment of borrowers in the United States, including Illinois consumers. Each of the 777 Defendants, working in concert, participated in the scheme through a coordinated pattern of racketeering; such efforts include oversight and approval of the collection of thousands of unlawful debts. Through such coordination, operation, and management of the lending business, the 777 Defendants induced Plaintiff and members of the Class and Subclass to repay unlawful debts. The foregoing record demonstrates that 777 Partners, through its subsidiaries or affiliates, and in concert with others, created the entire lending structure in an effort to circumvent state and federal lending laws and regulations. Such intentional misconduct is exactly the type of coordinated activity that RICO was intended to stamp out.

169. Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital conducted or participated in the conduct of the affairs of ZocaLoans through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

170. Plaintiff was deprived of money as a result of the 777 Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the enterprise, which money transfers would not have been made but for the 777 Defendants' conduct.

35

171.     In addition, Plaintiff and members of the below Class and Subclass have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, the 777 Defendants are jointly and severally liable to Plaintiff and the putative members of the Class and Subclass for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## CLASS ALLEGATIONS

172.     Plaintiff brings this claim on behalf of one Class and one Subclass, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

173.     The Class consists of all persons (a) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans, (b) while residents of the United States (except Delaware, Idaho, Missouri, and Utah), and (c) which loan was made on or after a date four years prior to the filing of suit.

174.     The Subclass consists of: (a) all individuals with Illinois addresses (b) to whom a Loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans (c) which loan was made on or after a date four years prior to the filing of suit.

175.     Plaintiff may alter the above class definitions to conform to developments in the case and discovery.

176.     The Class and Subclass are so numerous that joinder of their members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 20,000 members of the Class, and at least 10,000 members of the Subclasss.

36

177. There are questions of law and fact common to members of the Class and Subclass, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.    Whether the loans at issue are "unlawful debts" as defined in RICO.

      b.    Whether Rosebud Lending LZO d/b/a ZocaLoans is an "enterprise."

      c.    Whether Defendants 777 Partners, F3EA Holdings, F3EA Servicing, Tactical, and F3EA Capital are associated with Rosebud Lending LZO d/b/a ZocaLoans.

      d.    Whether Defendants 777 Partners, F3EA Holdings, F3EA Servicing, Tactical, and F3EA Capital conducted or participated in the affairs of Rosebud Lending LZO d/b/a ZocaLoans through a pattern of making and collecting unlawful loans.

178. Plaintiff will fairly and adequately represent the members of the Class and Subclass. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

179. Plaintiff's claims are typical of the claims of the members of the Class and Subclass. All are based on the same factual and legal theories.

180. A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible.

      b.    Members of the Class and Subclass are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the Class and Subclass and against Defendants for:

     i.      Treble damages;

     ii.     Attorney's fees, litigation expenses and costs of suit; and

     iii.    Such other or further relief as the Court deems proper.


Dated: May 29, 2025                          */s/ Matthew J. Goldstein*

                                         Edward A. Wallace
                                         Mark R. Miller
                                         Matthew J. Goldstein
                                         **WALLACE MILLER**
                                         150 N. Wacker Drive, Suite 1100
                                         Chicago, IL 60606
                                         T: 312.261.6193
                                         F: 312.275.8174
                                         eaw@wallacemiller.com
                                         mrm@wallacemiller.com
                                         mjg@wallacemiller.com

                                         *Counsel for Plaintiff*

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

*/s/ Matthew J. Goldstein*

Edward A. Wallace
Mark R. Miller
Matthew J. Goldstein
**WALLACE MILLER**
150 N. Wacker Drive, Suite 1100
Chicago, IL 60606
T: 312.261.6193
F: 312.275.8174
eaw@wallacemiller.com
mrm@wallacemiller.com
mjg@wallacemiller.com

*Counsel for Plaintiff*

Dated: May 29, 2025